UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MICHAEL B. PRYOR,

Petitioner,

v.

M. SPEARMAN,

Respondent.

No.  2:14-cv-01521-DB

ORDER

Petitioner is a state prisoner proceeding through counsel with a petition for a writ of habeas corpus under 28 U.S.C. § 2254.  Petitioner challenges his 2011 conviction imposed by the Tehama County Superior Court for cultivating, possession of, and transportation of marijuana, and for driving with a suspended or revoked license.  This matter proceeds on claims one and five in petitioner's second amended habeas petition.  (ECF No. 80.)  Petitioner alleges he was denied due process when he was denied the right to file a motion to suppress evidence and the prosecutor threatened a witness rendering her unavailable to testify.  (ECF No. 60.)  Both parties have consented to the jurisdiction of a magistrate judge in this case.  (See ECF Nos. 7, 17, 83.)  For the reasons set forth below, this court will deny the petition.  See 28 U.S.C. § 636(c)(1).

////

////

////

1

**BACKGROUND**

**I.     Facts Established at Trial**

The California Court of Appeal for the Third Appellate District provided the following

summary of some of the evidence presented at trial:[1]

> In three consolidated cases that were based on multiple searches
> taking place on three different dates, a jury convicted defendant of
> two counts of cultivating marijuana (Health & Saf. Code, § 11358)
> (counts I and IV), three counts of possession of marijuana for sale
> (Health & Saf. Code, § 11359) (counts II, V and IX), transporting
> marijuana (Health & Saf. Code, § 11360, subd. (a)) (count VIII), and
> misdemeanor driving on a revoked license (Veh. Code, § 14601.1,
> subd. (a)) (count X).  Defendant admitted the special allegations that
> he was released on bail when he committed the offenses in the later
> two cases (Pen. Code, § 12022.1).  In a fourth case, defendant pled
> no contest to conspiracy (Pen. Code, § 127).  He was sentenced to
> nine years in prison.
>
> Defendant contends his conviction must be reversed because he was
> not permitted to challenge the legality of one of the searches during
> trial.  He contends that once the trial court learned at trial of evidence
> suggesting the first search may have been illegal, the court had a duty
> to investigate the legality of that search. . . .
>
> . . .
>
> *Defendant's Motion for a Mistrial*
>
> The first witness at trial was Norman Andreini, who testified about
> his lease arrangement with defendant for the Balis Bell Road
> property.  [RT[2] at 66–68.]  On cross-examination, Andreini testified
> he had flown over the property in the summer of 2009 because
> defendant had stopped making lease payments and Andreini was
> going to evict him.  [RT at 70–71.]  Andreini entered the property
> once during the eviction process; "[t]he night before he was raided."
> [RT at 71.]  When asked how he knew defendant was going to be
> raided, Andreini responded, "Because I was asked by the officers to
> make sure the plants were still there and if he was."  [RT at 71.]
> Andreini confirmed that the officers asked him to inspect the
> property and make sure the plants were still there.  [RT at 71–72.]
>
> Defense counsel, claiming he was surprised to hear about this
> advance inspection, argued he was entitled to bring a suppression
> motion, if necessary.  [RT at 72.]  The court called a recess and met
> with counsel in chambers off the record.  [RT at 72.]  After the recess,
> the defense had no more questions for Andreini.  [RT at 72.]  The
> trial proceeded with other witnesses.

---

[1] The undersigned has independently reviewed the trial record and confirms the accuracy of the state court's recitation of the evidence presented at trial, including the excerpts that are cited herein.

[2] "RT" refers to the Reporter's Transcript on Appeal, volumes 1 through 3.

1  Lodged Doc. 1 at 1–4.

2  **A.  Marijuana Plants Found on Petitioner's Properties and Petitioner's Motion for
3  Mistrial**

4          Eric Clay ("Clay"), an investigator with the Tehama County District Attorney's office,

5  was designated as an expert in the possession of marijuana for sale and the cultivation of

6  marijuana.  RT at 73–77.  He investigated petitioner in 2009 and obtained a search warrant for the

7  July 30, 2009 search of petitioner's residence on Ivy Lane in Red Bluff, petitioner's business

8  (Norcal Powder Coating) on Vista Way in Red Bluff, petitioner's wife's business on Vista Way

9  in Red Bluff, and property that petitioner leased on Balis Bell Road.  RT at 77, 82.

10         While on the Balis Bell Road property, Clay encountered petitioner driving a pickup with

11  a water tank trailer who told him he was out watering his plants.  RT at 78–79.  Clay conducted a

12  search of the property and found three separate garden sites with a total of 191 marijuana plants

13  growing in metal drum-style barrels.  RT at 80.  There were also two generators on the property;

14  one was connected to a well for pumping water and the other was being used to power a campsite.

15  RT at 81–82.

16         Clay opined that the marijuana found at Balis Bell Road was processed for sale.  RT 83.

17  He supported his opinion, explaining:

18              Mainly based on the volume of the plants being grown and what
19              those plants would have yielded product wise, close to 200 plants is
               definitely going to produce so much marijuana that one person
20              couldn't consume it themselves, so it wouldn't be for personal use.

21              The second thing is that it's been my experience with other marijuana
               investigations that someone who spends as much money on a
22              marijuana garden such as this; the leasing of the property, the fuel
               that it takes to travel out to the property to take care of the plants, the
23              materials and supplies needed for the grow, it could be into the tens
               of thousands of dollars in expenses that someone's not going to spend
24              that much money for marijuana for themselves when they could go
               buy a usable amount on the street for under a hundred dollars.

25              And in addition to that to continue, marijuana loses THC value over
               a period of time, so you're not going to grow the rest of your life's
26              worth of personal consumption marijuana, because marijuana loses
               THC value and after -- depending on how it's stored -- it's going to
27              have no THC value, which is what the user wants.

28  RT at 83–84.  Clay estimated the plants found would have produced between one to two pounds

1   of marijuana bud per plant at approximately $3,000 per pound based on his knowledge of the

2   price of marijuana in northern California in 2009.  RT at 84–85.  An average amount of marijuana

3   used by one person is approximately one-half gram.  RT 87.

4        Clay also based his opinion on statements petitioner made to Andreini that he would come

5   into a large sum of money in the fall, which is the harvest time for outdoor marijuana grown in

6   the area.  RT at 87.

7        Another factor Clay considered was the fact that there were multiple marijuana gardens on

8   a single piece of property.  RT at 87.  Clay explained that it is also common for large scale

9   marijuana growers to spread their gardens out over a geographic area so that all is not lost if one

10  gets raided.  RT at 87–88.  Clay also discussed the fact that the barrels the plants were found in

11  were in a camouflage pattern in wooded areas and a tan color in a dirt field with dry grass,

12  suggesting they were being concealed.  RT at 88.

13       During the search of petitioner's residence on Ivy Lane, law enforcement found about

14  $5,700 in $20 bills as well as a small user amount of marijuana, approximately 40 grams.  RT at

15  90.  Clay explained, "[a] larger amount of cash . . . than the average person has on hand and the

16  fact that they're all in 20s can be consistent with drug sales."  RT at 90.

17       Investigators found a growing tray at petitioner's business, "which is typically used for

18  cloning marijuana plants, taking clippings off a larger marijuana plant, and starting new

19  marijuana plants or starting from seed in these trays."  RT at 90–91.  There were also some grow

20  lights, nutrients, and some clone mix, the latter of "which is a chemical used to help promote root

21  growth when you do cut clippings from a marijuana plant to start a new marijuana plant from a

22  cloned marijuana plant."  RT at 91.

23       On cross-examination, Clay testified that it was possible that he spoke to Andreini the day

24  before the execution of the search warrant.  RT at 92.

25       Richard Davidson ("Davidson"), an expert in the possession of marijuana for sale or the

26  cultivation of marijuana, testified for the prosecution as follows.  RT at 110.  Davidson obtained a

27  search warrant for three locations based on his investigation of petitioner: one location on

28  Emerson Road, another location on Stice Road, and a third location on Ivy Lane (petitioner's

4

1    residence).  RT at 111.  The search warrant was served on August 30, 2010 and Davidson went to

2    the Emerson Road location in a rural area of Tehama County.  RT at 111.  They found three

3    locations on the property with a total of 197 marijuana plants.  RT at 112.  Davidson found

4    potting soil and receipts for potting soil bearing petitioner's name.  RT at 115.  Davidson was

5    informed 30 budding marijuana plants were found at the Stice Road location and 23 marijuana

6    plants were found growing indoors at the Ivy Lane location.  RT at 116.  Davidson explained the

7    difference between an indoor marijuana grow versus an outdoor marijuana grow, including

8    advantages of growing indoors such as being able to control the settings and continually keep a

9    crop going.  RT at 116–18.

10        Davidson also served a search warrant on October 25, 2010 at a location on Kimberly

11    Farms Drive in Shasta County.  RT at 118.  Davidson found marijuana drying on strings in a shop

12    building, an indoor grow room, and marijuana being processed in the residence on the property.

13    RT at 119–22.  Davidson counted a total of 99 plants on the property.  RT at 120.  Davidson also

14    found a scale on the Kimberly Farms property, which he explained is significant because "[o]ften

15    most of the time a subject who is going to be selling marijuana will weigh it out so he knows

16    exactly how much marijuana is in a particular bag for the sales."  RT at 126.  Similarly, clear

17    plastic bags were found, which are "often used for the storage of marijuana" after it is "weighed

18    out, and then sold in increments."  RT at 126.

19        The Kimberly Farms electricity bill was approximately $12,000, which shows that

20    "somebody is conducting an indoor marijuana cultivation" because "[t]he lights for marijuana

21    cultivation require a lot of electricity."  RT at 127.  The same pots were used at the Stice Road,

22    the Emerson Road, and the Kimberly Farms properties.

23        Davidson opined that the marijuana found at the Stice Road, Emerson Road, Ivy Lane,

24    and Kimberly Farms properties were possessed for sale "[b]ased on the large quantity of

25    marijuana being grown at both locations" and the amount of product found would not "be

26    conductive for any type of personal use."  RT at 129.

27        On October 27, 2010, Davidson contacted petitioner during a traffic stop in Tehama

28    County.  RT at 131.  Petitioner's vehicle was searched and a plastic tub containing 11

1   individually wrapped 1-pound marijuana packages was found.  RT at 131–32.  The fact that the

2   packages were each 1-pound was significant because "when a subject is selling large quantities of

3   marijuana, they will often sell them in one pound increments."  RT at 132.  After the traffic stop,

4   and based on what they found in petitioner's vehicle, Davidson went to petitioner's residence

5   where another approximately 1-pound bag of marijuana was found.  RT at 132–33.  Davidson

6   opined that the marijuana found on October 27, 2010 was possessed for sale because the packages

7   were "exactly the same, tied the same, and then concealed in a container and being transported

8   by" petitioner.  RT at 134.

9           As the Court of Appeal summarized:

10              The next day, defendant moved for a mistrial, claiming that Andreini
                went to the property "probably prior" to the search warrant being
11              signed.  Counsel explained this was the first that he had learned of
                Andreini's visit and, had he known earlier, he would have made a
12              proper motion under Penal Code section 1538.5.  He argued a due
                process violation, but could point to no authority supporting his
13              request for a mistrial.  He claimed prejudice, arguing the People had
                used information from a warrantless search by an agent to get a
14              search warrant.  The court found no information to support that
                conclusion and denied the mistrial.[3]
15

16  Lodged Doc. 1 at 4; see also RT at 154–60.

17          The prosecution next called Timothy Braund ("Braund") who testified that petitioner

18  offered to purchase Braund's travel trailer for $2,500 up front until later when he would be able to

19  pay it off for $18,000.  RT at 162.  Similarly, several witnesses testified regarding petitioner's

20  intent to rent and in some instances later purchase the properties where marijuana plants were

21  found for large sums of money.  RT at 167–202.

22  ////

23  ////

24  ////

25

26  [3] [Footnote 3 in Original]  An arguably more plausible explanation, suggested by the trial court, is that Andreini
    discovered the marijuana during his flight over the property and reported it to the police, who then investigated and
27  obtained a search warrant.  Before executing the warrant, the officers asked Andreini to confirm that the marijuana
    was still there.  Andreini led the officers to the Balis Bell Road property.  Even if the flight over the property was at
28  the direction of law enforcement--and there is no evidence that it was--aerial surveillance of open fields without a
    warrant is legal.  (People v. Stanislawski (1986) 180 Cal.App.3d 748, 754.)

David Baker ("Baker"), a former detective with the Tehama County Sheriff's office,

testified that he discovered an indoor marijuana grow in the garage of the Ivy Street property with

23 marijuana plants along with receipts for various growing supplies in the residence.  RT at 204–

08, 212, 216.

**B.  Tanya Hale's Testimony**

Petitioner called Tanya Hale ("Hale") as a witness who testified that she helped petitioner

water marijuana plants and install an infrastructure for growing the plants.  RT at 278–79.  The

trial court stopped the proceedings and engaged in discussion with counsel outside the presence

of the jury.  During this time petitioner's counsel agreed that Hale would need to be advised of

her Fifth Amendment rights and informed the court that "there would be no further questions of

this witness."  RT at 280.

The trial court advised Hale, "the reason I stopped this proceeding[] is that, in just the few

words of testimony that you gave, one possibility is that you are confessing to felony cultivation

of marijuana in front of a whole room full of witnesses."  RT at 280.  The court further informed

Hale, "[y]ou have the right not to incriminate yourself under the Fifth Amendment.  You have the

right to talk to an attorney about that if you want to."  RT at 280–81.  The prosecution indicated it

intended to ask Hale questions.  RT at 281.  The court gave Hale three options: "One is, I

understand all that and I don't care, and I want to testify.  One is, I understand,d and I now refuse

to testify and don't want to say anything more.  And third one would be, in between, which is, I

want to go talk to a lawyer."  RT at 281–82.  The trial court reiterated to Hale that, "you are

sitting on the witness stand under oath and you have just [begun] to testify about what we call

cultivation of marijuana," which the court explained is "a felony punishable by state prison."  RT

at 282–83.  Ultimately, Hale chose to speak with an attorney and the court instructed her to step

down from the stand while it worked on finding her a public defender.  RT at 283.

Hale later retook the stand and her appointed counsel stated that she advised her to take

the Fifth Amendment and not testify further.  RT at 353.  The prosecution asked Hale one

question regarding a prior statement and Hale informed the court she intended to take the Fifth

Amendment.  RT at 353–54.  Hale's counsel stated on the record that she "advised her to take the

1   Fifth Amendment and not answer any more questions on the basis they may incriminate her and

2   expose her to criminal prosecution." RT at 354.  The court then released Hale as a witness.  RT at

3   354.

4   **C.  Nature's Nexus**

5   Petitioner called Kimberly Marshall ("Marshall") who testified that she was employed

6   with Nature's Nexus, a medical marijuana co-op that provided cannabis to California

7   recommended patients.  RT at 420.  Nature's Nexus gets its medical marijuana from its members

8   and petitioner was authorized to provide Nature's Nexus with cannabis.  RT at 423, 426.

9   During cross-examination, Marshall testified that she did not promise to buy marijuana

10  from petitioner.  RT at 427.  Nor was there an agreement that petitioner would receive $8 per

11  hour for his time.  RT at 428.  Similarly, she did not discuss with petitioner the costs of growing

12  his marijuana, including a price per gram or ounce of marijuana.  RT at 428.  Nature's Nexus

13  would not hold a member's marijuana and the organization had never reimbursed an individual

14  for leasing property to grow marijuana, for power bills, or for smart pots.  RT at 430–32.  Finally,

15  Nature's Nexus has always had a policy not to have oils.  RT at 445.

16  **D.  Recommendations Found on Petitioner's Properties**

17  Clay was called by petitioner who testified that he found a number of medical marijuana

18  recommendations in petitioner's vehicle and posted on trees at the various garden sites.  RT at

19  252–53.  The recommendations contained eleven different names.  RT at 252.  During the

20  prosecution's cross-examination, Clay testified that the presence of the recommendations added

21  to his opinion that the marijuana found was possessed for sale.  RT at 264.  He based his opinion

22  in part on his knowledge of the belief that the more recommendations an individual has means the

23  more marijuana plants he can possess.  RT at 265–66.  Clay agreed that the "these copies of

24  recommendations were being used as a shield or ruse to cover up what was going on."  RT at 267.

25  Petitioner also called Davidson as a witness who testified that he found 115 medical

26  marijuana recommendations at the Stice Road property with different names.  RT at 270.

27  Davidson was recalled by the prosecution and testified regarding his follow-up on the marijuana

28  recommendations found at the Balis Bell property.  RT at 482.  He was unable to locate anyone

8

1   by the names of Angie Lockett or Steve Lockett, and an address he found for the latter did not

2   exist.  RT at 482–83.  He was also unable to locate a Charles Bradley associated with the

3   addresses Clay provided.  RT at 484.

4   Petitioner called Danny Clough ("Clough") as a witness who testified on cross-

5   examination that he never gave petitioner a recommendation for Carrie Fox, Jacob Schell, Christy

6   Godkin, Ralph S. Chestnut, Charles Bradley, Jamie Anderson, Steve or Angie Lockett, Zack

7   Anderson, or James Kindred.  RT at 456–58.

8   The prosecution called Vinicio Colon ("Colon") who testified that he was the office

9   manager for the Redding office of Natural Care for Wellness, which is engaged in cannabis

10   therapy.  RT at 489.  The organization collects data on customers and Colon was unable to find

11   anyone in the organization's database named Zack Anderson or Jamie Anderson.  RT at 490–91.

12   The prosecution called Carrie Fox ("Fox") who testified that she had a medical

13   recommendation for the use of marijuana that had been stolen out of her car.  RT at 492–93.  She

14   also testified that she had never given her recommendation to petitioner or Clough.  RT at 493.

15   Similarly, the prosecution called Jacob Schell ("Schell") who testified that he had a

16   recommendation for the use of medical marijuana in 2009 and that he never gave it to petitioner,

17   Clough, or anyone to grow marijuana for him.  RT at 495.

18   **II.     Relevant Procedural Background**

19   Petitioner was found guilty of two counts of cultivating marijuana, three counts of

20   possession of marijuana for sale, transportation of marijuana, and driving with a suspended or

21   revoked license with priors.  RT at 607–11; see also CT at 257–66.  Petitioner admitted the

22   special allegations that he was released on bail when he committed some of the offenses.  RT at

23   612–16, 620–24.  Petitioner later pled no contest to one count of conspiracy to commit a crime.

24   RT at 630–32.

25   On May 2, 2011, petitioner was sentenced to nine years in state prison.  RT at 653.

26   Petitioner immediately filed a notice of appeal from the judgment.  CT at 323–24.

27   ////

28   ////

9

**A. State Court Petition for Review (Court of Appeal Case No. C068159, Supreme Court Case No. S205140)**

On December 12, 2011, petitioner filed his opening brief with the Court of Appeal arguing in part he was denied due process because he was unable to challenge the July 30, 2009 search of his properties.[4]  Lodged Doc. 17.

On August 28, 2012, the state court of appeal affirmed the conviction and denied petitioner's claim that he was denied due process.  Lodged Doc. 1.

On September 5, 2012, petitioner filed a petition for review with the California Supreme Court.  Lodged Doc. 2.

On October 31, 2012, the petition for review was denied without comment.  Lodged Doc. 3.

**B. First Petition for Writ of Habeas Corpus Filed in State Court (Court of Appeal Case No. C075734, Supreme Court Case No. S217813)**

On December 9, 2013, plaintiff filed a petition for writ of habeas corpus in the Superior Court of California for the County of Tehama.  Lodged Doc. 4.  In his petition, petitioner raised his fifth claim for prosecutorial misconduct on the ground the prosecutor threatened Hale. Lodged Doc. 4 at 7.  Petitioner argued that Hale's subsequent arrest during a recess in court when she was on the stand as a witness interfered with his right to present witnesses.  Lodged Doc. 4 at 7–12.

On December 20, 2013, the Superior Court of California for the County of Tehama issued a ruling denying the petition for writ of habeas corpus, including the prosecutorial misconduct claim.  Lodged Doc. 5.  The court found that plaintiff failed to raise his claim on direct appeal and that petitioner's conclusory allegations did not support that Hale's testimony would have led to a more favorable result.  Lodged Doc. 5.

On February 7, 2014, petitioner filed a petition for writ of habeas corpus in the California Court of Appeal for the Third Appellate District raising the same argument on prosecutorial

////

---

[4] The record does not contain the petition filed with the California Court of Appeal.

10

1    misconduct.  Lodged Doc. 8 at 7–12.  On February 13, 2014, the Court of Appeal denied the

2    petition.  Lodged Doc. 9.

3          On April 10, 2014, petitioner filed his habeas petition raising the same or similar claims

4    with the California Supreme Court, Lodged Doc. 10, and that petition was denied without

5    comment on May 14, 2014, Lodged Doc. 11.

6          **C.  Second Petition for Writ of Habeas Corpus Filed in State Court**

7          On January 24, 2014, petitioner filed a petition for writ of habeas corpus in the Superior

8    Court of California for the County of Tehama.  Lodged Doc. 6.  Petitioner again raised his

9    prosecutorial misconduct claim.  Lodged Doc. 6 at 7–12.

10         On February 5, 2014, the Superior Court of California again denied the petition as

11   successive, noting that petitioner had filed "an identical writ."  Lodged Doc. 7.

12         **D.  Second Petition for Writ of Habeas Corpus filed with the California Supreme
            Court (Supreme Court Case No. S244435)**

13

14         On September 20, 2017, following proceedings in this court, a petition for writ of habeas

15   corpus was filed with the California Supreme Court wherein petitioner raised his due process and

16   prosecutorial claims, and attached a declaration from Hale in support of the latter claim.  Lodged

17   Doc. 20.

18         On August 15, 2018, the California Supreme Court denied the petition with a citation to

19   People v. Villa, 45 Cal. 4th 1063 (2009) (habeas petitioner may not challenge expired conviction

20   for which he or she is no longer in custody).  Lodged Doc. 25.

21         **STANDARDS OF REVIEW APPLICABLE TO HABEAS CORPUS CLAIMS**

22         An application for a writ of habeas corpus by a person in custody under a judgment of a

23   state court can be granted only for violations of the Constitution or laws of the United States.  28

24   U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

25   application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502

26   U.S. 62, 67–68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

27   ////

28   ////

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Greene v. Fisher, 565 U.S. 34, 37 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405–06 (2000)). Circuit court precedent "'may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably.'" Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 567 U.S. 37 (2012)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct." Id. at 1451. Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. Carey v. Musladin, 549 U.S. 70, 76–77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003) (quoting Williams, 529 U.S. at 405–06). "Under the 'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct

12

1    governing legal principle from th[e] [Supreme] Court's decisions, but unreasonably applies that

2    principle to the facts of the prisoner's case.'"  Lockyer v. Andrade, 538 U.S. 63, 75 (2003)

3    (quoting Williams, 529 U.S. at 413); Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  "[A]

4    federal habeas court may not issue the writ simply because that court concludes in its independent

5    judgment that the relevant state-court decision applied clearly established federal law erroneously

6    or incorrectly.  Rather, that application must also be unreasonable."  Williams, 529 U.S. at 411;

7    see also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Andrade, 538 U.S. at 75 ("It is not

8    enough that a federal habeas court, in its independent review of the legal question, is left with a

9    firm conviction that the state court was erroneous." (Internal citations and quotation marks

10   omitted.)).  "A state court's determination that a claim lacks merit precludes federal habeas relief

11   so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

12   Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652,

13   664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a

14   state prisoner must show that the state court's ruling on the claim being presented in federal court

15   was so lacking in justification that there was an error well understood and comprehended in

16   existing law beyond any possibility for fairminded disagreement."  Richter, 562 U.S. at 103.

17          There are two ways a petitioner may satisfy subsection (d)(2).  Hibbler v. Benedetti, 693

18   F.3d 1140, 1146 (9th Cir. 2012).  He may show the state court's findings of fact "were not

19   supported by substantial evidence in the state court record" or he may "challenge the fact-finding

20   process itself on the ground it was deficient in some material way."  Id. (citing Taylor v. Maddox,

21   366 F.3d 992, 999–1001 (9th Cir. 2004), overruled on other grounds by Murray v. Schriro, 745

22   F.3d 984, 999-1000 (9th Cir. 2014)); see also Hurles v. Ryan, 752 F.3d 768, 790–91 (9th Cir.

23   2014) (If a state court makes factual findings without an opportunity for the petitioner to present

24   evidence, the fact-finding process may be deficient and the state court opinion may not be entitled

25   to deference.). Under the "substantial evidence" test, the court asks whether "an appellate panel,

26   applying the normal standards of appellate review," could reasonably conclude that the finding is

27   supported by the record.  Hibbler, 693 F.3d at 1146.

28   ////

                                              13

1    The second test, whether the state court's fact-finding process is insufficient, requires the

2    federal court to "be satisfied that any appellate court to whom the defect [in the state court's fact-

3    finding process] is pointed out would be unreasonable in holding that the state court's fact-finding

4    process was adequate." Hibbler, 693 F.3d at 1146–47 (quoting Lambert v. Blodgett, 393 F.3d

5    943, 972 (9th Cir. 2004)).  The state court's failure to hold an evidentiary hearing does not

6    automatically render its fact-finding process unreasonable.  Id. at 1147.  Further, a state court may

7    make factual findings without an evidentiary hearing if "the record conclusively establishes a fact

8    or where petitioner's factual allegations are entirely without credibility." Perez v. Rosario, 459

9    F.3d 943, 951 (9th Cir. 2006) (citing Nunes v. Mueller, 350 F.3d 1045, 1055 (9th Cir. 2003)).

10    If a petitioner overcomes one of the hurdles posed by § 2254(d), this court reviews the

11    merits of the claim de novo.  Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also

12    Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may

13    not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we

14    must decide the habeas petition by considering de novo the constitutional issues raised.").  For the

15    claims upon which petitioner seeks to present evidence, petitioner must meet the standards of 28

16    U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual basis of [the] claim

17    in State court proceedings" and by meeting the federal case law standards for the presentation of

18    evidence in a federal habeas proceeding.  See Cullen v. Pinholster, 563 U.S. 170, 186 (2011).

19    The court looks to the last reasoned state court decision as the basis for the state court

20    judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

21    "[I]f the last reasoned state court decision adopts or substantially incorporates the reasoning from

22    a previous state court decision, [this court] may consider both decisions to 'fully ascertain the

23    reasoning of the last decision.'" Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en

24    banc) (quoting Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005)).  "When a federal claim

25    has been presented to a state court and the state court has denied relief, it may be presumed that

26    the state court adjudicated the claim on the merits in the absence of any indication or state-law

27    procedural principles to the contrary." Richter, 562 U.S. at 99.  This presumption may be

28    overcome by showing "there is reason to think some other explanation for the state court's

14

1   decision is more likely." Id. at 99–100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

2          Similarly, when a state court decision on a petitioner's claims rejects some claims but

3   does not expressly address a federal claim, a federal habeas court must presume, subject to

4   rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 568 U.S. 289,

5   293 (2013). When it is clear, that a state court has not reached the merits of a petitioner's claim,

6   the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court

7   must review the claim de novo. Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099,

8   1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

9                                              **ANALYSIS**

10   **I.      Whether the Court has Jurisdiction**

11          According to the record, it is undisputed that petitioner was released from incarceration on

12   August 27, 2014 and discharged from post-release community supervision on August 27, 2015.

13   See Lodged Doc. 21 at 4; ECF No. 84 at 48–49; ECF No. 85-10 at 15.

14          Respondent challenges this court's jurisdiction in light of petitioner's release from

15   incarceration, arguing that because petitioner is no longer in custody, his petition must be

16   dismissed (1) for lack of jurisdiction, and (2) on the ground the petition is rendered moot

17   following his release.[5]  ECF No. 84 at 14–22. Alternatively, respondent requests that he be

18   dismissed because he is no longer a proper respondent in this case. Id. at 21–22.

19   **A. Jurisdiction**

20          Federal courts may not entertain a petition for writ of habeas corpus filed by a state

21   prisoner unless the prisoner is in custody in violation of the Constitution or laws or treaties of the

22   United States at the time the application for habeas relief is filed. 28 U.S.C. § 2254(a); Carafas v.

23   LaVallee, 391 U.S. 234, 239–40 (1968). If the statutory "in custody" requirement is satisfied, the

---

[5] The court notes that respondent's same arguments were presented in a separate case and subsequently rejected. Compare Eastern District of California Case No. 2:14-cv-0079-KJM-KJN, ECF No. 46 (setting forth the exact same arguments respondent makes herein); with Khatkarh v. Cal. Dep't of Corr. & Rehabilitation, No. 2:14-CV-0079 KJM KJN P, 2018 WL 662343 (E.D. Cal. Feb. 1, 2018) (rejecting respondent's same arguments and recognizing that "a habeas petition does not become moot upon a petitioner's release from custody if the petition challenges a conviction to which 'specific, concrete collateral consequences' have attached" (quoting Spencer v. Kemna, 523 U.S. 1, 9 (1998). This accounts for respondent's inexplicable reference to "findings and recommendations" in its answer filed in this case. See ECF No. 84 at 18–19 (arguing the "findings and recommendations are wrong" and the "authority relied on by the findings and recommendations focus on mootness and collateral consequences").

1    court's jurisdiction is not defeated by the petitioner's subsequent release from custody or the

2    expiration of his sentence prior to completion of proceedings on his application.  Carafas, 391

3    U.S. at 238.

4         Here, petitioner filed his petition for writ of habeas corpus on June 26, 2014 while he was

5    still in custody, and he was not discharged from post-release community supervision until August

6    27, 2015.  ECF No. 84 at 48–49; ECF No. 85-10 at 15.  Thus, this court has jurisdiction and

7    petitioner is "entitled to consideration of his application for relief on its merits."  Carafas, 391

8    U.S. at 239; Chaker v. Crogan, 428 F.3d 1215, 1219 (9th Cir. 2005) (explaining that "if a

9    petitioner is in custody at the time he files his federal habeas petition, his subsequent release from

10   custody does not deprive the court of its jurisdiction" (citing Carafas, 391 U.S. at 238; United

11   States v. Spawr Optical Research, Inc., 864 F.2d 1467, 1470 (9th Cir. 1988))).

12        **B.  Mootness**

13        Respondent next argues that there is no remaining nexus between petitioner's claims and

14   custody.  ECF No. 84 at 17.  Citing Bailey v. Hill, 599 F.3d 976 (9th Cir. 2010), respondent

15   argues that "Bailey could not condone a bare challenge to an underlying conviction."  ECF No.

16   84 at 17.  In other words, there is no redressability available to him as an out-of-custody petitioner

17   because he no longer suffers the restraint imposed by incarceration, which is the only complaint a

18   petitioner can make under § 2254(a).  Id. at 17–18 (citing Douglas v. Jacquez, 626 F.3d 501, 504

19   (9th Cir. 2010)).

20        In response, petitioner argues that his claims should not be dismissed for lack of continued

21   in custody status because he remains subject to collateral consequences.  ECF No. 86 at 2–5.

22   Specifically, petitioner argues that "[h]e cannot engage in certain contracts, and his licensing is

23   under a continuing shadow from the Tehama County conviction."  Id. at 4; see also ECF No. 86-1

24   (petitioner's counsel's declaration stating petitioner "has struggled to establish a business as an

25   arborist[,] . . . numerous business loans were denied on the basis of his conviction[,] . . . [h]is

26   effort to obtain a contractor's license was delayed for a year[, and] . . . [h]e has been denied

27   contracts with PG&E and Cal Fire due to his record").

28   ////

1    Petitioner agrees that "it may be appropriate to substitute the Governor or the Attorney

2    General, as the keepers of criminal records, in place of the Warden."  ECF No. 86 at 5.

3         "An incarcerated convict's (or a parolee's) challenge to the validity of his conviction

4    always satisfies the case-or-controversy requirement, because the incarceration (or the restriction

5    imposed by the terms of the parole) constitutes a concrete injury, caused by the conviction and

6    redressable by invalidation of the conviction."  Spencer v. Kemna, 523 U.S. 1, 7 (1998).  "Once

7    the convict's sentence expires, however, some concrete and continuing injury other than the now-

8    ended incarceration or parole—some 'collateral consequence' of the conviction—must exist if the

9    suit is to be maintained" and not considered moot.  Id.  It is well-established that courts may

10   presume that a criminal conviction has continuing collateral consequences, "or, what is

11   effectively the same, to count collateral consequences that are remote and unlikely to occur."  See

12   id. at 8–12 (noting that the Supreme Court has been willing to accept the possibility of collateral

13   consequences in the future for criminal convictions (citing Evitts v. Lucey, 469 U.S. 387

14   (1985)));  see also Sibron v. New York, 392 U.S. 40, 55 (1968) (noting that "the Court abandoned

15   all inquiry into the actual existence of specific collateral consequences and in effect presumed

16   that they existed").

17        Once a petitioner's sentence has expired, some "collateral consequence" of the conviction

18   must exist in order for the suit to be maintained and not considered moot.  Respondent argues "if

19   a petitioner cannot allege the only claim available:  that current custody is illegal, he has no

20   standing, and the federal court is powerless to provide a remedy."  ECF No. 84 at 19.  In rejecting

21   a similar argument as that advanced by respondent here, the Ninth Circuit has explained:

22            The state next argues that this case is moot, contending that Chaker
             is no longer suffering any significant collateral consequences as a
23            result of his misdemeanor criminal conviction. This argument is
             foreclosed by Chacon v. Wood, 36 F.3d 1459, 1463 (9th Cir.1994),
24            overruled on other grounds, 8 U.S.C. § 2254(c). In Chacon, we
             recognized an irrefutable presumption that collateral consequences
25            result from any criminal conviction. See id. We explained that
             "[o]nce convicted, one remains forever subject to the prospect of
26            harsher punishment for a subsequent offense as a result of federal
             and state laws that either already have been or may eventually be
27            passed." Id.; accord Wood v. Hall, 130 F.3d 373, 376 (9th Cir. 1997);
             Larche v. Simons, 53 F.3d 1068, 1070–71 (9th Cir. 1995). Because
28            Chaker faces the prospect of harsher punishment at a later date as a

17

1  result of his conviction . . . , his claim continues to present a live
2  controversy.

Chaker, 428 F.3d at 1219; see also Goldyn v. Hayes, 444 F.3d 1062, 1063 n.2 (9th Cir. 2006)

(explaining that the habeas action before it was not moot because the adverse consequences of the

petitioner's conviction remained).

Respondent's reliance on Bailey and Douglas are equally unavailing.  As explained in

Khatkarh, respondent's reading of Bailey is "incorrect."  Khatkarh, 2018 WL 662343, at *1.

Rather,

> The Bailey court held that "a nexus between the petitioner's claim
> and the unlawful nature of his custody" is part of § 2254(a)'s
> jurisdictional requirement that a habeas petitioner be "in custody" at
> the time the habeas petition is filed.  Bailey, 599 F.3d at 980. Nothing
> in the Bailey decision changed the fundamental rule that this
> jurisdictional requirement attaches at the time the petition is filed and
> that subsequent release from custody does not deprive the federal
> court of jurisdiction; in fact, this rule is expressly stated in Bailey.
> See id. at 979 ("The petitioner must be in custody at the time the
> petition is filed, see Carafas v. LaVallee, 391 U.S. 234, 238 (1968),
> but the petitioner's 'subsequent release from custody does not itself
> deprive the federal habeas court of its statutory jurisdiction.' Tyars
> v. Finner, 709 F.2d 1274, 1279 (9th Cir. 1983).").

Id.  Regarding Douglas, the Ninth Circuit did not hold that a federal court's power is limited only

to conditional or unconditional release from custody.  Rather, it held that the federal court lacked

authority to issue an instruction that the state court revise its judgment.  Douglas, 626 F.3d at 504.

Respondent's reliance on Douglas is misplaced and ignores well-established precedent, including

the Supreme Court's direction in Carafas, which stated that "amendments to the habeas corpus

statute seem specifically to contemplate the possibility of relief other than immediate release from

physical custody . . . speak[ing] in terms of 'release from custody or other remedy.'"  Carafas,

391 U.S. at 239 (citations omitted); see also Holley v. Yarborough, 568 F.3d 1091, 1102 (9th Cir.

2009) (holding that "[a]lthough habeas petitions are typically granted as a means of releasing the

petitioner from custody, the federal habeas statute 'does not limit the relief that may be granted to

discharge of the applicant from physical custody.'" (citing Carafas, 391 U.S. at 238–39)).

Here, because there is an irrefutable presumption of "collateral consequences" flowing

from the challenged conviction that will continue to affect petitioner, this action has not been

rendered moot by the expiration of his incarceration.  Carafas, 391 U.S. at 239; Pollard v. United

States, 352 U.S. 354, 358 (1957) (holding that "[t]he possibility of consequences collateral to the imposition of sentence is sufficiently substantial to justify our dealing with the merits"); see also Chaker, 428 F.3d at 1219.

Even setting aside the fact that collateral consequences are presumed and the collateral consequences doctrine necessarily applies, the doctrine would still apply because petitioner established that he continues to suffer consequences from his conviction, including the denial of work contracts and inability to obtain a business loan.  ECF No. 86-1; accord Carafas, 391 U.S. at 237 (finding clear that the petitioner's cause was not moot because in consequence of his conviction, the petitioner could not, *inter alia*, engage in certain businesses, and as a result he has a "substantial stake in the judgment of conviction which survives the satisfaction of the sentence imposed on him" (internal quotations and citations omitted)).

Thus, the "case or controversy" requirement has been satisfied and this case is not moot. The court now turns to the merits of petitioner's two remaining claims.

## II.    Claim 1 – Denial of Due Process as a Result of the Denial of Petitioner's Motion for a Mistrial

### A.  Decision of the State Court

In the only reasoned state court decision, the California Court of Appeal considered this issue and held as follows:

> *Alleged Inability to Challenge the July 2009 Search*
>
> Defendant contends the judgment must be reversed due to his "inability" to challenge the July 30, 2009 search.  He contends the use of Andreini as a police agent violated the Fourth Amendment.
>
> *A.    The Law*
>
> Bringing a motion to suppress evidence during trial is generally disfavored because it thwarts the purposes of Penal Code section 1528.5 and misuses judicial resources.  (*People v. Jackson* (1992) 7 Cal.App.4th 1367, 1370, fn. 3; *People v. Smith* (1973) 30 Cal.App.3d 277, 280.)  Such a motion is permitted, however, under limited circumstances.  "If, prior to the trial of a felony or misdemeanor, opportunity for this motion did not exist or the defendant was not aware of the grounds for the motion, the defendant shall have the right to make this motion during the course of trial."  (Pen. Code, § 1538.5, subd. (h).)

19

*B.     Analysis*

Defendant has not shown that he attempted to make a motion to suppress during trial.[6] Even if we assume that, during the conference in chambers, the trial court denied defendant's request to bring a suppression motion, defendant still fails to show error. There is a "due diligence" requirement for a belated motion to suppress under Penal Code section 1538.5. (*People v. Martinez* (1975) 14 Cal.3d 533, 537–538; *People v. Frazier* (2005) 128 Cal.App.4th 807, 828.) While defendant established that he did not know about Andreini's visit to the property the day before the search, he did not establish that he could not have discovered this fact exercising due [diligence]. More importantly, he has failed to establish that the search warrant, which was signed on July 29, was based in any part on Andreini's visit of the same day.[7] As the trial court found, there is simply no evidence that the search warrant was improper or that Andreini's visit at the direction of law enforcement played any role in obtaining the search warrant.

Defendant contends that once evidence of a *possible* illegality in the search came to light, the trial court had a duty to investigate it. Defendant cites no authority for this proposition, but instead equates it with a court's duty to inquire into conflicts between counsel and client or juror misconduct. However, and to the contrary, absent a proper showing by defendant, a trial court is directed *not* to entertain a suppression motion during trial. (*People v. Smith, supra*, 30 Cal.App.3d at p. 280 [although the trial court chose to entertain a belated suppression motion at trial, "it was incumbent upon the court not to do so"].)

Lodged Doc 1 at 5–6.

**B.     Analysis**

**1.     Legal Standard**

"[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Stone v. Powell, 428 U.S. 465, 494 (1976); see Newman v. Wengler, 790 F.3d 876, 880–81 (9th Cir. 2015) (holding Stone survived enactment of AEDPA). "The relevant inquiry is whether petitioner had the opportunity to litigate his claim, not whether he did in fact do so or even whether the claim was correctly decided." Ortiz–Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir.

---

[6] [Footnote 4 in Original]  We remind defendant that it is *his* burden on appeal to present an adequate record to affirmatively show error. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

[7] [Footnote 5 in Original]  Neither the search warrant, nor the affidavit of probable cause supporting it, is in the record on appeal.

1996) (citations omitted); see also Newman, 790 F.3d at 878 (explaining that, "[u]nder Stone, exclusionary rule claims were barred if the petitioner had a full and fair opportunity to litigate them below whether or not they were actually adjudicated on the merits").

### 2. Was the State Court Opinion Contrary to or an Unreasonable Application of Clearly Established Federal Law?

Here, petitioner agrees that "the merits of the suppression motion are not in issue at this stage." ECF No. 60-1 at 14. This is correct as the record does not show that petitioner made a motion to suppress. Rather, petitioner only moved for a mistrial on the ground that he was not provided the opportunity to pursue a motion to quash a search warrant or a motion for suppression of evidence. RT at 72, 154–60. The state court found that petitioner failed to show he made a motion to suppress during trial but even assuming he did, he failed to show error. More specifically, he failed to establish that the July 29, 2009 search warrant was based in any part on Andreini's visit that same day. Lodged Doc. 1 at 5–6.

Petitioner argues he raised his Fourth Amendment claim when he moved for a mistrial, claiming that Andreini went to the property "probably prior" to the search warrant being signed. The trial court heard petitioner's argument and, finding no support for the argument, denied the motion for mistrial. Petitioner again bases his argument on speculation, claiming that "[t]he timing of [Andreini's] statement *may be* such that the search warrant relied upon information derived from a police agent during an illegal search." ECF No. 60-1 at 17 n.4 (emphasis added).

As stated above, the relevant inquiry on federal habeas review is whether petitioner had an opportunity to litigate his claim, not whether he in fact did so or even whether the claim was correctly decided. Ortiz–Sandoval, 81 F.3d at 899. Petitioner received this opportunity. After petitioner's counsel raised the issue of a motion for suppression, the court held an off-record conversation with the parties in chambers. RT at 72. Thereafter, on the record, petitioner's counsel stated he had no further questions for Andreini "based upon conversations in chambers." RT at 72. The following day, petitioner's motion for mistrial was heard in open court and petitioner argued Andreini went to the property he leased to petitioner "probably prior, before the search warrant was" signed. RT at 154. Petitioner further argued for a mistrial on the grounds

21

1    that he was denied due process because his counsel "should have been afforded that due process

2    for that material to be able to quash the search warrant or present a [California Penal Code

3    §] 1538.5 motion, if necessary, and it should have been able to be done prior to this trial date."

4    RT at 155–56.  After hearing arguments from both sides, the trial court denied the motion, finding

5    "no information in the file to support" petitioner's conclusory arguments.  RT at 159–60.

6         This court's review of the record shows that the state court provided petitioner with a "full

7    and fair opportunity to litigate" his Fourth Amendment claim.  See Stone, 428 U.S. at 494;

8    Moormann v. Schriro, 426 F.3d 1044, 1053 (9th Cir. 2005) (explaining that "[i]f the state has

9    provided a state prisoner an opportunity for full and fair litigation of his Fourth Amendment

10   claim, we cannot grant federal habeas relief on the Fourth Amendment issue"); Abell v. Raines,

11   640 F.2d 1085, 1088 (9th Cir. 1981) (emphasizing "that '[u]nder Stone a federal district court

12   may not relitigate a fourth amendment issue tried fully and fairly in a state court, regardless of its

13   view of the correctness of the state decision.'" (quoting Mack v. Cupp, 564 F.2d 898, 901 (9th

14   Cir. 1977))).  "'As in Stone itself, all we have is a claim of error—and that is not enough to

15   support collateral relief based on the exclusionary rule.'"  Newman, 790 F.3d at 881 (quoting

16   Hampton v. Wyant, 296 F.3d 560, 565 (7th Cir. 2002)).

17        Accordingly, petitioner is not entitled to habeas relief, and the petition on this claim is

18   denied.

19   **III.    Claim 5 – Prosecutorial Misconduct Through Witness Intimidation**

20        **A.    Decision of the State Court**

21        In the only reasoned state court decision, the Superior Court of California for the County

22   of Tehama considered this issue and held as follows:

23            Concerning Petitioner's second ground raised, the court minutes
             reflect that Tanya (Shoffner) Hale was called as a witness and
             advised of her Fifth Amendment right.  She requested a public
24           defender.  One was appointed.  She was advised to assert her Fifth
             Amendment privilege which she did.  Furthermore, the
25           conclusionary allegations do not support that her testimony, had she
             chosen to give it, would have . . . led to a more favorable result[].
26

27   Lodged Doc. 5 at 2.

28   ////

1

    **B.   Analysis**

2

        **1.   Legal Standard**

3       "Undue prosecutorial interference in a defense witness's decision to testify arises when

4   the prosecution intimidates or harasses the witness to discourage the witness from testifying, for

5   example, by threatening the witness with prosecution for perjury or other offenses."  Williams v.

6   Woodford, 384 F.3d 567, 601–02 (9th Cir. 2004) (citations omitted).  The Ninth Circuit "ha[s]

7   repeatedly held that 'substantial government interference with a defense witness's free and

8   unhampered choice to testify amounts to a violation of due process.'"  Earp v. Davis, 881 F.3d

9   1135, 1145 (9th Cir. 2018) (quoting United States v. Vavages, 151 F.3d 1185, 1188 (9th Cir.

10  1998)).

11      In addition to proving that the prosecutor engaged in witness intimidation by a

12  preponderance of the evidence, a state prisoner seeking habeas relief must also prove that he was

13  prejudiced by that intimidation.  Id.; see also Sandoval v. Calderon, 241 F.3d 765, 778 (9th Cir.

14  2000) (explaining that, "[t]o warrant habeas relief, [the petitioner] must show that the

15  prosecutor's improper argument 'had [a] substantial and injurious effect or influence in

16  determining the jury's verdict.'" (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)

17  (additional quotations and citation omitted))).

18
        **2.  Was the State Court Opinion Contrary to or an Unreasonable Application of
             Clearly Established Federal Law?**
19

20      Petitioner argues that Hale was prevented from testifying "by prosecution harassment and

21  threats to prosecute."  ECF No. 60-1 at 23.

22      In support of his petition, petitioner included a declaration from Hale in which she states

23  that "[a]fter taking an oath to testify truthfully at trial and being seated on the witness stand, I was

24  advised to seek counsel from the office of the public defender during the start of testimony."

25  ECF No. 60-6 at 2.  She further claims that "[f]ollowing removal from the witness stand, I was

26  detained, taken to a small room in the courthouse by an armed bailiff from the Tehama county

27  Sherriff office [sic]."  Id.  Apparently, "[o]nce alone in the room, with no attorney present, I

28  remembered the threat made by detective David Baker to the effect of 'If I testify, I will be

                                            23

arrested and put in jail with my sister (Tracy Pryor).'" Id.  Hale claims that she was "frightened

beyond description" and was "certain that they would make good on their threat and decided not

to test them." Id.

Finally, Hale claims that she would have stated the following during the trial had she

testified:

> 1   To the best of my knowledge, I never observed Michael Pryor
>     participate in the sales of any marijuana.
> 2   All marijuana cultivated was exclusively Natures Nexis
>     cooperative.
> 3   I observed medical prescriptions, scripts, posted on trees linking
>     the plants to specific individual patients.
> 4   I observed binders with scripts inside.
> 5   I believed that all marijuana was being grown for medicinal
>     purposes only for clients of Natures Nexis.

Id.

Here, petitioner fails to show that the alleged witness intimidation had any impact on his

case.  The state court's decision was not unreasonable and correctly pointed out that Hale herself

requested a public defender, one was appointed, she was advised to assert her Fifth Amendment

privilege, and Hale informed the court that on advice of counsel she intended to invoke her Fifth

Amendment right after which she was released as a witness.  See RT at 278–83, 353–54.

Petitioner's (and Hale's) claim that the prosecution improperly threatened Hale with

prosecution is not supported by the record.  The trial court stopped the proceedings after Hale

testified that she helped petitioner water marijuana plants and install an infrastructure for growing

the plants.  RT at 278–81.  The trial court advised Hale that it stopped the proceedings because

her testimony could be a confession to felony cultivation of marijuana.  RT at 280.  It should go

without saying that a confession to a felony carries with it the potential to be arrested but the trial

court also advised Hale that the cultivation of marijuana "is a felony punishable by state prison."

RT at 282–83.  Hale was given the option of speaking with an attorney, which she accepted.  RT

at 281–83.  After that, Hale and her counsel advised the court that she intended to invoke her

Fifth Amendment privilege.  RT at 353–54.  Nothing in the record suggests that Hale intended to

testify but chose not to because she was threatened.  She and her counsel made clear to the court

that she was exercising her right to invoke the Fifth Amendment.

1      Whether or not Detective Baker informed Hale that she would be arrested is immaterial.

2  Assuming Baker was acting on behalf of the prosecutor, even if Baker did tell Hale that she

3  would be arrested if she testified, this is essentially the same thing the trial court informed Hale

4  when it stopped the proceedings—that her testimony could be a confession to a felony punishable

5  by state prison.  Indeed, Hale's own counsel stated on the record that she "advised her to take the

6  Fifth Amendment and not answer any more questions on the basis they may incriminate her and

7  *expose her to criminal prosecution*."  RT at 354 (emphasis added).  Thus, even if the court were

8  to believe Hale's declaration that Baker made a comment to her, it did not amount to misconduct

9  or a threat or otherwise deprive petitioner of a fair trial.  Baker did not imply anything beyond

10 what the trial court and Hale's counsel informed her was a risk she would be assuming if she

11 chose to testify further.

12     In the context of the entire trial, it cannot be said that the alleged comment Baker made to

13 Hale "so infected the trial with unfairness as to make the resulting conviction a denial of due

14 process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974); Darden v. Wainwright, 477 U.S.

15 168, 181 (1986).  Nor does the record support a finding that the prosecution's conduct vis-à-vis

16 Baker amounted to a substantial interference with Hale's free and unhampered decision to testify

17 or not to testify.  Williams, 384 F.3d at 601–02.  The record reflects that Hale took the stand after

18 consulting with appointed counsel and knowingly and voluntarily elected to take the Fifth

19 Amendment in response to one question from the prosecution.  RT at 353–54.  Hale's

20 understanding on the record that she was entitled to take the Fifth Amendment does not lend to a

21 finding that she was intimidated.

22     Even assuming Hale had testified, the state court was not unreasonable in finding that

23 petitioner failed to establish that her testimony, had she chosen to give it, would have led to a

24 more favorable result.  Lodged Doc. 5 at 2.  It is abundantly clear from the record there was no

25 prejudice.  The separate evidence presented by the prosecution refuted what Hale claims she

26 "believed" and created a strong case against petitioner.

27     This evidence included, among other things, testimony from (1) Marshall that Nature's

28 Nexus did not promise to buy marijuana from petitioner, Nature's Nexus did not hold a member's

25

marijuana for them, and the organization never had oils, RT at 416–45; (2) Clough that he did not

give petitioner a recommendation for Carrie Fox, Jacob Schell, Christy Godkin, Ralph S.

Chestnut, Charles Bradley, Jamie Anderson, Steve or Angie Lockett, Zack Anderson, or James

Kindred, RT at 456–58; (3) Davidson that he was unable to locate anyone by the names of Steve

Lockett, Angie Lockett, or Charles Bradley, RT at 482–84; (4) Colon who was unable to find

anyone in Natural Care for Wellness' database named Zack Anderson or Jamie Anderson; (5) Fox

who testified her medical recommendation was stolen and she never gave it to petitioner or

Clough, RT at 492–93; (6) Schell who had never given his recommendation to petitioner, Clough,

or anyone to grow marijuana for him, RT at 495; (7) Clay who agreed that recommendations

found on petitioner's property were being used as a shield or ruse to cover up what was going

on—that the marijuana found was possessed for sale, RT at 267; and (8) Davidson who opined

that the marijuana found at four properties was possessed for sale based on the "large quantity of

marijuana being grown" and the amount was not "conductive for any type of personal use," RT at

129.

Petitioner made no attempt to explain how Hale's testimony would have changed the

outcome of his trial considering the evidence against petitioner was more than sufficient to

sustain his conviction.  See ECF No. 60-1 at 23–28; see Brecht, 507 U.S. at 623 (explaining that a

petitioner must establish that the misconduct had a "substantial and injurious effect or influence

in determining the jury's verdict"); Darden, 477 U.S. at 182 (emphasizing that strong evidence

against a petitioner "reduce[s] the likelihood that [a] jury's decision was influenced by" a

prosecutor's misconduct).

In sum, the record does not support a finding of witness intimidation and, in any event,

Hale's declaration does not generate a reasonable probability that the result of the proceeding

would have been different had she testified.  Thus, the absence of her testimony did not infect the

trial with unfairness or have a substantial and injurious effect on the jury's verdict.  Sandoval v.

Calderon, 241 F.3d at 778.

Accordingly, petitioner is not entitled to habeas relief, and the petition on this claim is

denied.

1     **IV.    Certificate of Appealability**

2         The federal rules require a district court that issues an order denying a habeas petition to

3 either grant or deny a certificate of appealability.  <u>See</u> Rules Governing § 2254 Cases, Rule 11(a).

4         A judge will grant a certificate of appealability "only if the applicant has made a

5 substantial showing of the denial of a constitutional right," and the certificate must indicate which

6 issues satisfy this standard.  28 U.S.C. § 2253(c)(3).  "Where a district court has rejected the

7 constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:

8 [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment

9 of the constitutional claims debatable or wrong."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

10 As discussed above, this court finds that petitioner has not made "a substantial showing of the

11 denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Moreover, petitioner has not

12 demonstrated that "reasonable jurists would find the district court's assessment of the

13 constitutional claims debatable or wrong."  <u>Slack</u>, 529 U.S. at 484.  Therefore, the court declines

14 to issue a certificate of appealability.

15                           **CONCLUSION**

16         For the foregoing reasons, IT IS HEREBY ORDERED that petitioner's petition for a writ

17 of habeas corpus is denied.

18 Dated:  August 17, 2020

19

20

21                 DEBORAH BARNES
                 UNITED STATES MAGISTRATE JUDGE

22 DLB:13(md)
DB/ORDERS/ORDER.PRISONER.HABEAS/pryor1521.order(3)

23

24

25

26

27

28